# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
------------------------------
JAMES A. COX,
        Plaintiff,
    v.          Cause No.
                3:16-cv-10961-NJR-MAB
JACQUELINE LASHBROOK, et al.,
        Defendants.
------------------------------

            DEPOSITION
              of
        ALFRED J. NADEL, M.D.
        Wednesday, April 17, 2019
            10:06 a.m.

Reported by:
Robin LaFemina, RPR, CLR

Page 2

            April 17, 2019
            10:06 a.m.


        DEPOSITION of ALFRED J. NADEL, M.D.,
held at the offices of Ice Miller, 1500
Broadway, New York, New York, before
Robin LaFemina, a Registered Professional
Reporter, Certified LiveNote Reporter and
Notary Public within and for the State of
New York.

Page 3

APPEARANCES

ICE MILLER
Attorneys for Plaintiff
    2000 West Madison
    Chicago, Illinois 60606
BY: RIELE SIMS, ESQ.
    (Via videoconference)
    riele.sims@icemiller.com


SANDBERG PHOENIX & von GONTARD P.C.
Attorney for Defendants LPN Marcia Hill, RN
Traci Peek, Dr. Allan Brummel and Dr. Vipin
Shah
    600 Washington Avenue - 15th Floor
    St. Louis, Missouri 63101-1313
BY: TIMOTHY R. TEVLIN, ESQ.
    (Via videoconference)
    ttevlin@sandbergphoenix.com

Page 4

APPEARANCES (C'td.)

KYRSTIN B. BEASLEY  (Via teleconference)
Assistant Attorney General
Attorney for Defendants Jacqueline Lashbrook,
Christine Brown, John Baldwin, Leslie Wood
and Stacey Brown
    201 West Point Drive, Suite 7
    Belleville, Illinois 62226
    kbeasley@atg.state.il.us

Page 5

(Defendants' Exhibit 1, Notice of Discovery Deposition, marked for identification, as of this date.)

(Defendants' Exhibit 2, Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action, marked for identification, as of this date.)

(Defendants' Exhibit 3, James A. Cox's Rule 26(A)(2)(B) Disclosure, marked for identification, as of this date.)

(Defendants' Exhibit 4, Alfred J. Nadel curriculum vitae, marked for identification, as of this date.)

(Defendants' Exhibit 5, History of Prior Testimony, marked for identification, as of this date.)

(Defendants' Exhibit 6, March 4, 2019 letter, marked for identification, as of this date.)

(Defendants' Exhibit 7, AME's Fee Schedule for the Services of Dr. Nadel, marked for identification,

Page 6

as of this date.)

(Defendants' Exhibit 8, List of Materials Relied Upon By Dr. Nadel, marked for identification, as of this date.)

(Defendants' Exhibit 9, Dr. Cohen report, marked for identification, as of this date.)

(Defendants' Exhibit 10, collection of the optometry records that were produced by the IDOC, marked for identification, as of this date.)

ALFRED J. NADEL, called as a Witness, having been first duly sworn by Robin LaFemina, a Notary Public within and for the State of New York, was examined and testified as follows:

EXAMINATION BY MR. TEVLIN:

Q.   Good morning, Dr. Nadel. My name is Tim Tevlin.

Am I pronouncing your name correctly?

Page 7

Nadel

A.   It's Nadel.

Q.   Nadel. Excuse me. Can you state your full name for the record, please?

A.   Yes. Alfred J. Nadel.

Q.   Dr. Nadel, where are you currently located for this deposition?

A.   At -- this building you mean now or --

Q.   Yes.

A.   -- my office?

Q.   Well, right now you're in New York City and we're having the deposition over phone conference or videoconference; is that correct?

A.   Correct; yes.

Q.   And you live full-time and practice in New York; is that correct?

A.   Yes.

Q.   Okay.

What do you do for a living?

A.   I'm an ophthalmologist.

Q.   Okay.

Are you currently a practicing ophthalmologist as in you see patients?

Page 8

Nadel

A.   Yes.

Q.   How long have you been practicing ophthalmology?

A.   Since 1967.

Q.   Other than being an ophthalmologist, do you have a particular specialty or focus within that field?

A.   I'm a retina specialist.

Q.   And you're currently retained as an expert witness in the case involving James A. Cox that's pending in the Southern District of Illinois; is that correct?

A.   Yes.

Q.   Okay.

Have you ever spoken with James Cox personally?

A.   No.

Q.   Have you ever -- well, strike that.

So you've never examined Mr. Cox or either one of his eyes personally either; is that correct?

A.   Correct.

Q.   And when did you first become

Nadel

an objection on the record to protect if anything came up regarding work product privilege.

MR. TEVLIN: Okay. So just to be clear, Ms. Court reporter, can we read back the last question subject to the objection?

(Whereupon, the requested portion of the record was read back by the reporter.)

A. No.

Q. Did you draft any initial draft of your report before submitting a final report to AME?

MS. SIMS: Objection. That's not discoverable.

Q. Sir, you can answer.

A. I'm sorry. What --

MS. SIMS: I want to -- objection. I am going to instruct him not to answer that question. The rules are very clear, that is not within the scope of discovery.

MR. TEVLIN: Well, there's case

Nadel

law saying that it's discoverable. I'm not asking to review the draft, I'm just asking whether drafts were prepared, and that leads to some relevant questions on whether or not he considered other information in amending the draft. So you made the objection to the notice, which we'll go through, but I think subject to me asking if any drafts were created, so we can understand if there's a basis to try to supplement, so that's why we're asking that now.

MS. SIMS: Well, that is my understanding of the law and that you have to move to compel that testimony.

MR. TEVLIN: Okay. So you're asking me to certify whether or not any drafts were prepared? My question -- I'm not saying that there's a basis to discover it. I just want to know if there are so that if we need to take something up with the judge and follow-up, we don't have to pay to get

Nadel

Dr. Nadel back here to answer three questions about whether or not he made a draft.

MS. SIMS: I understand, but my understanding is that there's a full protection regarding draft reports or disclosures, so I object to whether or not he can get into drafts at all.

MR. TEVLIN: Okay. I'll certify the question and maybe we can follow-up with written deposition questions if necessary to the court. Is that fair?

MS. SIMS: Yes. That's fair.

Q. Dr. Nadel, do you understand the question that I asked about whether or not you prepared initial drafts before submitting a final report?

A. I'm not sure that I do understand that.

Q. So let's -- I draw your attention to what has been marked Defendants' Exhibit 6.

(Witness reviewing document.)

Q. So you're reviewing Defendants'

Nadel

Exhibit 6, and this is the report you -- the final report you submitted in this case, it's dated March 4, 2019?

A. Yes.

Q. Okay.

My question was whether or not any rough drafts or initial drafts were prepared before you came up with this final report, and I was asking if you understand that question. Does that clarify?

A. You mean something that was a preliminary report that came before this report?

Q. Yes. That's what I'm asking about.

A. Can I answer that?

MS. SIMS: He's asking if you understand that that's what he's asking about.

A. That I understand.

Q. Okay. So that you understand. Counsel is trying to instruct you not to answer that question. I would just say that we'll certify it and take it up with the

# Alfred J. Nadel, M.D., F.A.C.S.

Retina Associates of New York, P.C.
140 East 80th Street
New York, NY 10075

March 4th, 2019

To Whom It May Concern:

This report concerning James Cox is based upon a review of the following materials: the First Amended Complaint filed with the United States District Court for the Southern District of Illinois; Exhibit A from the United States District Court, Southern District of Illinois, East St. Louis Division; the Deposition of James A. Cox; Offender Outpatient Progress Notes, Illinois Department of Corrections; Offender Optometric Examinations dated 2/12/13, 9/22/15, 12/1/15, 1/13/16, 2/10/16, 11/16/16, and 11/5/17; an offender injury report dated 8/6/15; medical records from the Marion Eye Center dated 1/25/16; and a report from Jack A. Cohen, M.D.

Mr. Cox was struck in the left eye on Aug. 6, 2015. He was seen by the nurse who noted a wound on the left eyebrow, a reddened sclera, and blurred vision. Mr. Cox indicated that he had swelling and pain but the note indicates no discomfort. The wound was washed. The note is countersigned by Dr. Vipin Shah. There is also a note from Dr. Shah 0n on 8/11/15. However, Dr. Shah is neither an optometrist nor an ophthalmologist. The first examination of Mr. Cox's eyes was performed on 9/22/15 by Dr. Allan J. Brummel, an optometrist. Vision in the injured left eye was recorded as 20/25 when corrected, compared with 20/20 on the examination in 2013 prior to the injury. The left pupil was noted to be enlarged and sluggish. The only other finding was a possible forming posterior sub capsular cataract. The next eye examination by Dr. Brummel in December, 2015 shows a vision of 20/30 in the left eye with the notation of a possible forming posterior sub capsular cataract. The examination in on January 13, 2016 by Dr. Brummel showed a posterior sub capsular opacity with a vision of 20/40-2. A vision of 20/40 was recorded in February, 2016. At this time, there is no notation of a cataract but there is a statement that the reduced vision in the left eye is due to trauma and that treatment is not possible. Mr. Cox was sent at this time to the Marion Eye Clinic for a retinal examination by OCT. The studies were normal. There was no retinal pathology centrally. The next examination by Dr. Brummel in June, 2016 records a vision of 20/30-1 in the left eye. The note makes no mention of a cataract but does mention retinal damage due to trauma. The note by Dr. Brummel in November, 2016 does not record vision. There is an illegible note on this date which seems to suggest a posterior sub capsular cataract. The last note of an eye examination, dated 11/5/17, is by another optometrist (name illegible) when vision in the left eye is noted to be 20/100 and the pupil is noted to be fixed and dilated. However, there are no notations in the examination portion of the record.

In terms of medical care, Mr. Cox should have been examined within 24-48 hours of his injury. The purpose of this examination would have been to determine whether there was any damage to



DEFENDANT'S DEPOSITION EXHIBIT

6

ASc 4/17/15

structures within the eye. When Mr. Cox was discovered by Dr. Brummel to have a cataract forming, referral should have been made to an ophthalmologist to determine whether or not, despite the early stage of development, surgery might be indicated. The ophthalmologist would not only have been able to perform an OCT to determine the integrity of the central retina (the macula) but would have been able better to examine the retinal periphery to look for pathology.

In terms of the medical records, the institution has notations of nurse attendance to the wound initially as well as a doctor's visit subsequently. There is a note requesting referral to an eye doctor but this was delayed until September 22. The records of Dr. Brummel do not meet medical standards. There are no remarks concerning the various ocular structures except on November 16, 2016 and no documentation that indirect ophthalmoscopy was performed to examine the retinal periphery. (The macular region was normal by OCT.) The record of June 6, 2016 contradicts the previous record in that vision is better and there is no mention of a cataract. There is no explanation for these changed findings. Although there is a description of a sluggish pupil on the first visit, this is the first time that pupillary dilation is noted. However, on this date and in November, 2016, the boxes are checked for round, equal, and reactive pupils. Additionally, Dr. Brummel refers to retinal damage although he notes that there was no edema on the OCT. The optometrist's exam in November, 2017 fails to describe the various ocular structures.

In terms of outcome, it is more difficult to render an opinion since there was no initial eye examination and the subsequent examinations by optometrists are lacking in descriptions of various ocular structures and are contradictory. If the concussive effect of the blow affected the iris and lens, there would not have been any treatment to prevent a dilated pupil or cataract formation. If there was blood in the eye (which cannot be known), this might have increased the risk of cataract formation. Hemorrhage within the eye can require treatment. From the records, it is not possible to know Mr.Cox's status at this time. If there is a cataract, surgery would be indicated with restoration of pre-injury vision, especially since there is documentation of a normal central retina. At the same time, it may be possible to perform a pupilloplasty to ameliorate the effect of a dilated pupil.


Alfred Nadel, M.D.