**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JAMES A. COX,**<br>**#K53474,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 16-cv-01096-NJR** |
| **JACQUELINE LASHBROOK,**<br>**CHRISTINE BROWN,**<br>**JOHN R. BALDWIN,**<br>**LESLIE WOOD,**[1]<br>**TRACI PEEK,**<br>**MARCIA HILL,**<br>**VIPIN SHAH,**<br>**STACEY BROWN, and**<br>**KAREN SIKORSKI,** *Independent*<br>*Administrator of the Estate of Allan J.*<br>*Brummel,* | |
| **Defendants.** | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Marcia Hill,

Traci Peek, and Dr. Shah (Doc. 122), a Motion for Summary Judgment filed by John

Baldwin, Christine Brown, Stacey Brown, Jacqueline Lashbrook, and Leslie Wood

(Doc. 125), and a Motion for Summary Judgment filed by Karen Sikorski, Independent

Administrator of the Estate of Dr. Brummel[2] (Doc. 134). For the reasons set forth below,

---

[1] The Clerk of Court is directed to correct the docket to reflect Les Wood's proper name as identified in the motion for summary judgment: Leslie Wood. (*See* Doc. 125).
[2] Dr. Brummel passed away after the suit was filed. On June 13, 2019, the Court entered an order substituting Karen Sikorski, the Independent Administrator for Dr. Brummel's estate, for Allan Brummel as a defendant in this case. (Doc. 124).

the Court grants in part and denies in part all three motions.

## BACKGROUND

Cox, an inmate in the Illinois Department of Corrections, filed this action under 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred at Pinckneyville Correctional Center ("Pinckneyville"). (Doc. 8). [3] According to the Amended Complaint, Cox was attacked by his cellmate on August 6, 2015. (Doc. 16, p. 3). He pressed the emergency button for ten minutes, but no one responded or came to his cell to assist him. Eventually he was able to get the attention of an inmate worker who contacted the floor officer, Correctional Officer Wood. When Wood arrived at the cell, he placed handcuffs on Cox through the chuck-hole. While being cuffed and unable to defend himself, the cellmate hit Cox with a hardcover book, severely injuring his left eye. (*Id*). He was taken to the infirmary, but was not seen by an optometrist until forty-five days following the attack, and in the following months received inadequate treatment for the injury to his eye and subsequent pain. (*Id*. at pp. 5, 11). As a result, he has permanent damage to his left eye, and his vision has deteriorated. Cox is proceeding on the following claims:

**Count 1:** Correctional Officer Wood failed to protect Cox from a violent attack by his cellmate in violation of the Eighth Amendment.

**Count 4:** Nurse Peek, Dr. Shah, and Dr. Brummel showed deliberate indifference to Cox's serious medical needs involving an injured left eye and pain associated therewith in violation of the Eighth Amendment.

---

[3] Although the action was filed *pro se* by Cox, the Court recruited counsel to represent him shortly after the case survived screening in May 2017, and he has been represented throughout discovery and dispositive motions. (*See* Docs. 16, 23, 28).

**Count 5:** Baldwin, Lashbrook, Stacy Brown, Nurse Hill, and Christine Brown showed deliberate indifference to Cox's serious medical needs involving an injured left eye and pain associated therewith in violation of the Eighth Amendment by failing to respond to Cox's grievances and complaints regarding his lack of treatment.

RELEVANT FACTS

On August 6, 2015, Cox was involved in an altercation with his cellmate. (Doc. 138, p. 2). Although the details of the altercation are disputed (Doc. 140, p. 2; Doc. 138, p. 2), a correctional officer arrived, and while ordering Cox to "cuff up," Cox's cellmate struck Cox with a hardcover book on the left side of his face. (Doc. 125, p. 3; Doc. 138, p. 3). Whether Cox was already handcuffed or not at the time he was struck with the book is another disputed fact. (Doc. 138, p. 3). Cox was taken to the healthcare unit and seen by Traci Peek, a registered nurse. (Doc. 123, p. 1; Doc. 140, p. 2).

At some point in August 2015, Cox was seen by Marcia Hill, a licensed practical nurse, who referred him to see a doctor. (Doc. 123, p. 1; Doc. 140, p. 5; Doc. 141-3, p. 4). He also saw Dr. Shah in August, although the dates and number of visits are at issue between the parties. (Doc. 123, p. 1; Doc. 140, pp. 3, 4). Cox saw the optometrist, Dr. Brummel, on September 22, 2015 (Doc. 140, p. 6.), and Cox was issued new prescription glasses on October 14, 2015. (*Id.* at p. 8). Dr. Brummel saw Cox again on December 1, 2015. He referred Cox to Marion Eye Clinic and ordered new prescription glasses for him. (Doc. 140, p. 8; Doc. 139, p. 21). Dr. Brummel also saw Cox on January 13, 2015, and documented a decline in vision. (Doc. 139, p. 13). Cox was sent on a furlough to Marion Eye Center for a macular OCT on January 25, 2016. (*Id.*). The results of the macular OCT appeared normal and showed no retinal abnormal findings. (Doc. 142-2, p. 23). At the

follow up appointment on February 10, 2015, Dr. Brummel recorded that no treatment was recommended. (Doc. 139, p. 14; Doc. 142, p. 23-24). Dr. Brummel saw Cox on June 1, 2015, and November 16, 2016. (Doc. 140, p. 7; Doc. 139, p. 8). Dr. Brummel ordered Cox new prescription glasses again on June 1, 2016, and on November 16, 2016, he ordered Cox photo-gray lenses. (Doc. 140, p. 8; Doc. 139, pp. 20, 21).

Prior to being seen by Dr. Brummel on September 22, 2015, Cox submitted at least four grievances regarding his pain and requesting treatment for his eye injury dated August 10, 2015, September 4, 2015, September 18, 2015, and September 21, 2015. (Doc. 125-6, pp. 6, 10, 17, 19; Doc. 138, p. 7).

## LEGAL STANDARDS

### I. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As

the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II.    *Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Id*. *Accord Greeno* v. *Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan,*

511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of serious harm") (internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood,* 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical

decision [ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter,* 836 F.3d 722, 731 (7th Cir. 2016))

(alterations in original). A medical professional's choice of an easier, less efficacious

treatment can rise to the level of violating the Eighth Amendment, however, where the

treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441.

## III.    *Failure to Protect*

"[P]rison officials have a duty ... to protect prisoners from violence at the hands of

other prisoners." *Farmer,* 511 U.S. at 833 (citation and quotation marks omitted). A prison

official's deliberate indifference to a substantial risk of serious harm may thus violate the

Eighth Amendment. *Id.* at 828. To succeed on a failure to protect claim, an inmate must

first objectively demonstrate that he is "incarcerated under conditions posing a

substantial risk of serious harm." *Id.* at 834. A beating of one inmate by another "clearly

constitutes serious harm." *Brown v. Budz,* 398 F.3d 904, 910 (7th Cir. 2005). Second, he

must show that prison officials acted with deliberate indifference to that risk, a subjective

inquiry into a prison official's state of mind. *Farmer,* 511 U.S. at 838-39.

A prison official may be held liable only if he knows an inmate faces a substantial

risk of serious harm and "disregards that risk by failing to take reasonable measures to

abate it." *Id.* at 847. An official who knows of a substantial risk of serious harm is free

from liability, however, if he or she "responded to the situation in a reasonable manner."

*Fisher v. Lovejoy,* 414 F.3d 659, 664 (7th Cir. 2005). A showing of negligence, or even gross

negligence, is insufficient to prove an official acted with deliberate indifference. The

standard is the "equivalent of criminal recklessness." *Grieveson v. Anderson*, 538 F.3d 763,

777 (7th Cir. 2008) (quoting *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)).

**ANALYSIS**

**I.     *Deliberate Indifference Claim against RN Traci Peek, LPN Marcia Hill, and Dr. Vipin Shah***

Defendants Peek, Hill, and Shah do not contest that Cox suffered from a serious medical condition but instead argue that Cox has not demonstrated that they acted with deliberate indifference in their evaluation and treatment of his eye injury or that substantial harm resulted from their conduct. (Doc. 122, p. 4).

Defendants allege that after Cox was injured by his cellmate, he was taken to the healthcare unit where he was evaluated by Nurse Traci Peek, who noted bruising, reddened left sclera, and a small sized wound on the outer portion of his eyebrow. (Doc. 123, pp. 1, 3). She referred him to Dr. Shah for examination. (*Id.*). That same day, August 6, 2015, Dr. Shah treated Cox and referred him to Pinckneyville's optometrist. (*Id.* at pp. 1, 4, 11). Pinckneyville does not have an optometrist on site full time, but Dr. Shah believed that the optometrist would be at the facility soon after August 6, 2015. (*Id.* at p. 4). Dr. Shah saw Cox again in the segregation unit on August 11, 2015; he assessed the eye and determined that Cox had a left orbit injury, and he again referred him to be seen by the optometrist the next morning. (*Id.)*. On August 16, 2015, Cox was treated at a nurse sick call appointment by Nurse Marcia Hill, who did not believe his injury was an emergency and referred him to the physician. (*Id.* at pp. 1, 5; Doc. 123-5, p. 2). Following these visits, Cox was treated by the optometrist, Dr. Brummel, from September 2015 through November 2016. (*Id.* at p. 1-2). Dr. Shah saw Cox three times between September 2015 and January 2016 without Cox complaining of eye issues. (*Id.* at p. 4).

*a.*     *RN Traci Peek and LPN Marcia Hill*

Nurse Peek argues that she treated Cox on one occasion immediately following his injury on August 6, 2015. (Doc. 123, p. 10). She claims that considering her objective findings, and because she is not a specialist and could not diagnose a significant eye injury, she referred him to the physician. She also recommended that Cox use ice and follow-up with sick call as needed. (*Id.* at p. 11). Although Cox disputes that he was treated by Dr. Shah that same day, Peek argues there is no dispute that she made the referral for Cox to see the physician. Because she relied on her professional judgment for the appropriate treatment plan and Cox has not presented evidence that she departed from accepted professional standards, he has not demonstrated that she acted with deliberate indifference. (*Id.*).

Nurse Hill first argues that Cox has not presented any evidence to support his claim that she ignored his medical requests. (*Id.* at p. 9). Nurse Hill claims that she does not process inmate grievances or medical request slips, and there is no evidence that she ever received any grievances or written medical requests directed to her. (*Id.*). Because medical providers cannot be found deliberately indifferent to an inmate's medical needs for situations over which they have no control, Nurse Hill cannot be liable for claims relating to his grievances or medical requests. (*Id.* at p. 9-10) (citing *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002)). Second, she cannot be liable for deliberate indifference regarding the care that she provided, as she followed the appropriate course of action. (*Id.* at p. 10). She saw Cox on one occasion, determined it was not an emergency, and that referral to the physician was appropriate. (*Id.*). Nurse Hill further argues that in the

Amended Complaint the allegations against her are only for the failure to respond to grievances and complaints filed by Cox. As he did not allege deliberate indifference to any treatment provided in the Amended Complaint, any additional claims regarding her treatment have been improperly raised in the Response in Opposition filed by Cox. (Doc. 145, p. 2).

Cox states that a jury could infer deliberate indifference because both nurses failed to follow the Illinois Department of Corrections Nursing Treatment Protocols for eye injuries when treating his eye injury. (Doc. 141, p. 11; *see also* Doc. 141-9, p. 5-6). He argues that "a failure to follow existing protocols, like assessing and documenting the information required in the IDOC Eye Injury form, creates an inference of deviation from medical standards…" (*Id.* at p. 12) (citing *Petties,* 836 F.3d at 730).

Specifically, Cox alleges that following the attack, Nurse Peek did not exam his eye, take his vitals, or provide pain relief medication or an ice pack. (*Id.* at p. 13). In his deposition, Cox states that in the healthcare unit following the altercation, Nurse Peek complained about her smoke break being interrupted and carried on a conversation with another nurse about what she did the night before. (*Id.* at p. 13, Doc. 137-6, pp. 8, 11). Cox also states that she did not ask him any questions regarding the injury. (Doc. 137-6, p. 11). Instead of providing him medical treatment, Nurse Peek "chose the easier option of referring" him to a medical doctor. (Doc. 141, p. 14).

Similarly, Cox argues that Nurse Hill also did not examine his eye or provide pain

relief medication or an ice pack during the August 11, 2015,[4] nurse sick call appointment. (Doc. 141, p. 14; p. 13; Doc. 137-6, pp. 15, 29). Instead of examining his eye or immediately taking him to medical, she too only referred him to a medical doctor. (Doc. 141, p. 13; Doc. 137-6, pp. 12, 15, 19). He alleges that if she had conducted a full examination, then Nurse Hill would have taken him immediately to healthcare that day for treatment. (Doc. 137-6, p. 19). Additionally, Cox claims that Nurse Hill inaccurately recorded his injury and symptoms. (Doc. 141, p. 14). She states in her affidavit that Cox complained that he "couldn't close his left eye," but all other evidence in the case demonstrates that Cox could not open his eye. He argues that she also falsely recorded that he experienced no discomfort and that he never had complained about his eye injury prior to the nurse sick call appointment, when he had actually attempted to contact someone in healthcare on multiple occasions. (Doc. 141, p. 14; Doc. 137-6, p. 14).

The Court finds that Nurse Peek is entitled to summary judgment on Cox's claim that she acted deliberately indifferent by not properly examining his eye injury. Cox does not dispute that following the altercation with his cellmate he was promptly taken to the healthcare unit where Nurse Peek cleaned his wound, but he argues that Nurse Peek's evaluation and treatment were inadequate and failed to follow nurse protocols, which "directly decreased his chance of being evaluated by a doctor." (Doc. 141, pp. 13, 14; Doc. 141-1, p. 3). Failure to follow healthcare protocols can "provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Petties,*

---

[4] Cox claims that he was seen by Nurse Hill at nurse sick call around August 11, 2016, (Doc. 137-6, pp. 15, 29), while Nurse Hill claims that the date of the nurse sick call visit was August 16, 2015 (Doc. 123-5, p. 2).

836 F.3d at 729 (quoting *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005)). Even if Nurse Peek had not evaluated his eye according to IDOC nursing protocols and acted unprofessionally during the exam, however, Cox has not demonstrated how Nurse Peek's decision to refer him to a doctor[5] rather than conduct a full evaluation herself "represents so significant a departure from accepted professional standard or practices that it calls into question whether the [provider] actually was exercising his professional judgment[,]" *Pyles*, 771 F.3d at 409, or was "blatantly inappropriate[.]" *Greeno*, 414 F.3d at 654. *See also Patton v. Przybylski*, 822 F. 2d 697, 700 (7th Cir. 1987) (unprofessional conduct does not violate the Constitution). Furthermore, accepting as true the claim that Cox did not see Dr. Shah until August 16, 2015, he has not presented any evidence for a jury to conclude that Nurse Peek knew that Cox did not see a doctor for another ten days following the attack or that she was responsible for the delay in scheduling the appointment. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 956 (7th Cir. 2019).

The Court finds, however, that there is a genuine issue of material fact regarding

---

[5] Cox has conflicting statements regarding when he was referred to a medical doctor. The Court finds that Cox's allegation in his supplemental declaration that Nurse Hill did not refer him to the medical doctor on April 6, 2015 (Doc. 141-3, p. 2-3), directly contradicts the statements in his deposition that he does not know what steps Nurse Peek took to contact the physician and that he did not know whether or not his appointment with Dr. Shah on August 16, 2015, was scheduled based on the offender injury report filled out by Nurse Peek that referred him to the medical doctor. (Doc. 137-6, pp. 26, 31). "As a general rule ... this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018) (quoting *Buckner v. Sam's., Club, Inc* 75 F.3d 290, 292 (7th Cir. 1996). "Thus, where deposition testimony and an affidavit conflict, 'the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken…'"*Dunn*, 880 F.3d at 910 (quoting *Russell v. Acme-Evans Co.*, 51 F3d 64, 67-68 (7th Cir. 1995)).Therefore, the Court disregards the contradictory statements and instead credits the deposition testimony. *See Jones v. Moore*, No. 03-56-CJP, 2006 WL 839422 at *3, n. 2 (S.D. Ill. 2006) ("a party cannot create questions of fact and/or credibility by belatedly issuing contradictory statements that ameliorate or contradict prior sworn statements, at least not without further support in the record.") (citations omitted).

whether Nurse Peek was deliberately indifferent to the pain that Cox experienced. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (treating a hernia and chronic pain it caused as separate medical conditions). *See also Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012) (holding that "prolonged, unnecessary pain as a result of a readily treatable condition" may constitute deliberate indifference). Cox claims that Nurse Peek disregarded his pain, and in his deposition, he states that he told Nurse Peek that his head was pounding and his pain was at a level ten, but he did not receive any medication or an ice-pack. (137-6, p. 34; *see also* Doc. 8, p. 68). Cox claims that from August 6, 2015, until his nurse sick call appointment, the pain was the exact same and that it "didn't go away." (Doc. 137-6, pp. 34, 35). When deciding summary judgment, the Court will not make credibility determinations. *See Townsend v. Fuchs,* 522 F.3d 765, 774 (7th Cir. 2008). Although Cox's allegations that he complained of pain to Nurse Peek are not supported by the medical records, a fact noted by Defendants (*see* Doc. 145, p. 4), it is possible that the observations written down by medical staff are inaccurate as Cox alleges. (*See* Doc. 141, pp. 13, 14). "Where the parties present two vastly different stories—as they do here—it is almost certain that there are genuine issues of material fact in dispute." *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007) (quoting *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003)). Because the accuracy of the medical records has been called into question, Nurse Peek is not entitled to summary judgment on the issue of whether she acted with deliberate indifference in treating Cox's pain.

As to Nurse Hill, the Court finds that there is a genuine issue of material fact regarding whether Nurse Hill provided constitutionally inadequate treatment and failed

to treat his pain. First, the Court does not find that the allegations against Nurse Hill regarding the treatment he received during his nurse sick call appointment are new claims improperly raised by Cox in his Response in Opposition. Although the Court characterized Count 5 in the merit review order of the Amended Complaint as against "grievance officials," his claims against Nurse Hill are not solely as a "grievance official." (Doc. 16, p. 12; Doc. 145, p. 2). The Court stated in the merit review order that Cox is claiming an Eighth Amendment claim against Defendants Baldwin, Lashbrook, Stacy Brown, Hill, and Christine Brown for deliberate indifference by "failing to respond to Plaintiff's grievances and *complaints* regarding his lack of treatment." (Doc. 16, p. 6) (emphasis added). The Court also summarized Cox's claim by stating that he "has alleged that he informed, via grievance or *otherwise*, many of the defendants about his medical issues." (*Id.* at p. 12) (emphasis added). Cox alleges in the Amended Complaint that he saw a nurse at nurse sick call who charged him five dollars "to add his name to the doctor call-line." (Doc. 8, p. 68). In his deposition, Cox also states that during the nurse sick call appointment with Nurse Hill, "what I said to her, she basically ignored. It went in one ear, out the other. I'm giving her specific details, and she is like—she writes inmate never complained about eye injury until now." (Doc. 137-6, p. 14). Cox is not raising a new claim at the summary judgment phase by arguing that Nurse Hill acted with deliberate indifference by failing to examine him at his nurse sick call appointment. His claim against her has always been an Eighth Amendment deliberate indifference claim for ignoring his complaints and failing to respond.

A review of the facts in the light most favorable to Cox assumes that at the time he

arrived at nurse sick call he had gone around five days without receiving treatment for his eye injury. Cox's expert, Dr. Nadel, an ophthalmologist, states in his report that Cox should have been examined within twenty-four to forty-eight hours after his injury (Doc. 141-4, p. 5), and Defendants' expert, Dr. Cohen, testified that he agreed "to that statement based on the fact of what the nurse and the doctors saw at the institution." (Doc. 123-6, p. 15). Even Dr. Shah states in his deposition that someone who is complaining of being hit in the eye with a hard-covered book should be seen by an eye doctor as soon as possible. (Doc. 123-3, p. 19). If, as Cox alleges, Nurse Hill did not examine his eye, notated incorrect observations in the medical records, and ignored his complaints that he had been trying for days to obtain medical care for his injury and pain, a reasonable jury could conclude that Nurse Hill departed "from the professional norm…[and] acted deliberately indifferent to [Cox's] health[,]" *Gayton*, 593 F.3d at 622 (citation omitted), by not examining him, ensuring he received immediate medical attention, and failing to provide him pain medicine. *See also Arnett*, 658 F.3d at 753 ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). Nurse Hill is therefore not entitled to summary judgment.

b.      **Dr. Shah**

Dr. Shah argues that he provided appropriate treatment and that Cox cannot demonstrate that he acted with deliberate indifference. (Doc. 123, p. 12). He examined Cox immediately after Nurse Peek on August 6, 2015, and referred Cox to the optometrist to ensure there was no inside eye damage. (*Id.* at p. 13). In his deposition, Dr. Shah states

that he did not have drops to dilate the eye, and thus he could only examine the outside of the eye, but not do a "full checkup" and examine for damage on the inside of the eye. (Doc. 123, p. 13; Doc. 135-2, p. 12). Dr. Shah determined based on Cox's vital signs, mild swelling, and blood in the eye, which is common after being hit, the situation was not an emergency. (Doc. 123, p. 13; Doc. 135-2, p. 12). He noted to visit Cox in segregation on his next rounds, which he did on August 11, 2015. (*Id.*). During the exam, Dr. Shah assessed the eye and determined that Cox had a left orbit injury and again referred him to the optometrist. (Doc. 123, p. 4). He ordered that Cox be seen by the optometrist the next morning. (*Id.*). Dr. Shah states he saw Cox three times between September 2015 and January 2015, but that Cox did not complain about eye issues during those visits. (*Id.*). Even if Dr. Shah did not see Cox until August 16, 2015, as Cox alleges, there is no evidence that proves that the delay in treatment exacerbated the injury. Dr. Shah further argues that he has no control over scheduling optometrist appointments and so he cannot be held liable for the delay in time between his optometry referral and the actual appointment on September 22, 2015. (*Id.* at p. 15).

Cox claims that he did not see Dr. Shah on August 6 or 11, 2015, and that his first appointment with him was in segregation on August 16, 2015. (Doc. 140, p. 4). During this exam, Cox alleges that Dr. Shah did not examine his eye. Dr. Shah told Cox that he was there to evaluate Cox for seizures and asthma, not the eye injury. (Doc. 137-6, pp. 13, 27, 35; Doc. 141, p. 8). Cox claims he told Dr. Shah that he felt like his "head was going to explode" because of the pain, but Dr. Shah informed Cox that he was not an eye doctor. (Doc. 137-6, p. 35). During the appointment on September 19, 2015, Cox claims that Dr.

Shah expressed surprised that Cox had still not yet seen an eye doctor. (Doc. 137-6, p. 15, Doc. 141, p. 8).

Cox argues not only that Dr. Shah denied and delayed medical treatment, but that Dr. Shah was deliberately indifferent to his extreme pain. (Doc. 141, p. 10). Cox's allegations that Dr. Shah never evaluated his eye injury, did not provide a treatment plan for his pain, and did not ensure that he was seen by an optometrist creates a genuine issue of material fact on whether Dr. Shah acted with deliberate indifference. (Doc. 137-6, p. 27). A reasonable juror could determine that because (1) Dr. Shah signed the injury report on August 6, 2015 (*Id.* at p. 11; Doc. 137-6, p. 13); (2) the healthcare unit was contacted in response to grievances and request slips Cox filed regarding his injury (Doc. 137-4, p. 2; Doc. 137-5, p. 2; Doc. 137-6, p. 7); and (3) both Nurse Peek and Nurse Hill referred him to be seen by the medical doctor, Dr. Shah knew the seriousness of Cox's injury and pain and was deliberately indifferent in failing to treat him. (*Id.* at p. 11). Although Defendants argue that Cox has no foundation to dispute entries in the medical records or schedule (Doc. 145, p. 6), it is up to the jury to determine the accuracy or truthfulness of the information contained within the records. Whether or not Cox is telling the truth is a question that the Court cannot resolve at summary judgment.

Furthermore, as previously mentioned, the experts retained by both parties and Dr. Shah agree that someone with a traumatic eye injury should be seen as soon as possible. (Doc. 141-4, p. 5; Doc. 123-6, p. 15; Doc. 123-3, p. 19). Dr. Shah repeatedly asserts that he does not control inmate scheduling. (Doc. 123, p. 4; 123-3, p. 14; Doc. 145, p. 5). During his deposition, however, he also states that as medical director he sees that each

offender's "plan of care is carried out" (Doc. 123-3, p. 26), and so there is an issue of fact regarding whether Dr. Shah had control over the circumstances that caused the delays. *Walker,* 940 F.3d at 964. Not only does Cox claim that his pain was prolonged by the denial and delay in care, but he has offered testimony from an expert that failure to promptly treat and evaluate his eye injury may have increased the risk of cataract formation. (Doc. 141-4, p. 6). *See Williams v. Liefer,* 491 F.3d 710, 715-16 (7th Cir. 2007) ("a plaintiff must provide 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm.") (citations omitted); *Gayton,* 593 F.3d at 625 ("only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation."). For these reasons, the Court denies Dr. Shah's motion for summary judgment.

## II. *Deliberate Indifference Claim Against Dr. Brummel*

Administrator Sikorski also does not contest that Cox suffered from a serious medical need. Rather, she argues that Cox cannot demonstrated that Dr. Brummel was deliberately indifferent in providing treatment. (Doc. 135, p. 14). She argues that there is no evidence that Dr. Brummel departed from professional standards when treating Cox. Dr. Brummel first treated Cox on September 22, 2015, determined that there was possible formation of a posterior subcapsular ("PSC") cataract on the left eye and measured his visual acuity, spherical, intraocular pressures, and cup-to-disc ratios. (*Id.* at p. 6). On this date there was no indication that Cox required cataract surgery. (*Id.* at p. 10).

Dr. Brummel saw Cox again on December 1, 2015, for an optometric evaluation

and Cox's complaint of blurred vision in his left eye. (*Id.* at p. 7). Dr. Brummel again measured Cox's visual acuity, intraocular pressures, and cup-to-disc ratios. During this appointment, Dr. Brummel decided to refer Cox to Marion Eye Clinic for a diagnostic OCT exam to make sure there was no macular disease or macular edema.

On January 13, 2016, Dr. Brummel saw Cox for an evaluation and regarding Cox's complaint that he still had not had his OCT exam. (*Id.*). Dr. Brummel again measured Cox's visual acuity, intraocular pressures, and cup-to-disc ratios, identified a PSC cataract, and documented a decline in vision. (*Id.* at p. 8). Because of the decline in Cox's vision, Dr. Brummel recommended amsler grid testing. On January 25, 2016, Cox was sent to Marion Eye Center for a macular OCT.

Dr. Brummel saw Cox on February 10, 2016, at a follow up appointment. The macular OCT of both eyes was normal with no retinal abnormal findings. (*Id.*). Dr. Brummel measured Cox's visual acuity in the left eye. (*Id.*). Dr. Brummel concluded that no treatment was recommended without an edema seen on the OCT diagnostic evaluation and that the reduced vision in the left eye was due to the traumatic injury. (*Id.* at p. 9). During the next evaluation on June 1, 2016, Dr. Brummel again measured Cox's visual acuity, intraocular pressures, and cup-to-disc ratios. Dr. Brummel assessed presbyopia, Anisocoria, and retinal damage due to trauma and that no treatment was possible.

Dr. Brummel last evaluated Cox's eyes on November 16, 2016. (*Id.*). He measured the intraocular pressures and cup-to-disc rations, documented the anterior and posterior segment exams as normal, and notated that there was a PSC cataract in the left eye. (*Id.*

at p. 10). Dr. Brummel ordered photo-gray lenses to address and prevent Cox's complaints of photophobia. (*Id.*). He also prescribed him new prescription glasses on three different occasions. (*Id.*).

Sikorski claims that Dr. Brummel made the determination that the appropriate treatment for Cox's blurry vision and photophobia was through prescription glasses and photo gray lenses and that additional treatment was not possible due to the traumatic injury. There is no evidence that any earlier treatment from medical providers would have prevented the Anisocoria or cataract formation. (*Id.* at p. 10). Cox also has not presented evidence that his changes vision were caused by any medical treatment he received at Pinckneyville, and his own expert testified that the blurred vision could have caused the cataract formation. (*Id.* at p. 7; Doc. 141-2, p. 21). Cox's allegations that Dr. Brummel should have referred Cox to an ophthalmologist for evaluation or surgery or provided an alternative treatment does not support a claim of deliberate indifference. (Doc. 135, p. 15).

Finally, Sikorski argues that Dr. Brummel had no control over Cox's scheduling or the alleged delay in treatment. But again, Cox has not presented any evidence that Dr. Brummel actually knew about Cox's injury or the interval between the injury date and the first appointment on September 22, 2019. (*Id.* at p. 18).

Cox argues that Sikorski's defense relies on Dr. Brummel's medical records, which are inconsistent and contradictory. (Doc. 142, p. 7). Dr. Nadel reported that the "records of Dr. Brummel do not meet medical standards[,]" and that "[t]here's so many flaws in these records that one has to question the validity of any of it." (Doc. 141-4, p. 6; Doc. 141-

2, p. 36). On September 22, 2015, Dr. Brummel recorded in the medical record that the pupils were round and equal in one section, while stating in the same document that the left pupil was twice the size of the right pupil in another. (Doc. 142, p. 8). In the records from September and December, Dr. Brummel notated the possible formation of a PSC cataract, and in January he recorded a posterior subcapsular opacity. (*Id.* at p. 8; Doc. 141-4, p. 5). There is not a notation, however, from the February or June appointments of a cataract. (141-4, p. 5; Doc. 123-6, p. 13). In November 2016, Dr. Brummel records "residual psc lens" — indicating there is a cataract, and there is no record of Cox's vision. (Doc. 123-6, p. 13). During the examination on June 6, 2016, Dr. Brummel recorded that Cox's vision was improving and noted a vision of 20/30-1 in the left eye, but as of November 5, 2017, Cox's vision was recorded at 20/100 in the left eye. (Doc. 142, p. 8; Doc. 123-6, p. 13). Cox argues there is no explanation for why the cataract is "identified, then disappeared, and then reformed" or for the inconsistencies in Cox's vision acuity. (Doc. 142, p. 8).

Additionally, Dr. Nadel reports that Dr. Brummel "refers to retinal damage" in the medical records, but he also "notes that there was no edema on the OCT[,]" and the OCT of both eyes appeared normal with no retinal abnormal findings. (Doc. 141-4, p. 6; Doc. 141-2, p. 25) (Dr. Nadel states in the deposition "you have an OCT that's perfectly normal, so what damage are you talking about?"). Dr. Nadel also testified that because of the incompleteness in the medical records, it cannot be determined based on the records whether additional treatment was required or whether Cox's dilated pupil and cataract formation were caused by the injury or inadequate treatment (Doc. 141-2, p. 37).

Cox further argues that Dr. Brummel's treatment deviated from medical

standards, and he failed to follow existing protocols during examinations and to perform many medical tests necessary to accurately diagnosis Cox's serious condition. (Doc. 142, p. 7). For example, during his initial examination of Cox, Dr. Brummel did not perform a cover test, a lamp exam, or an ophthalmoscopy. (*Id.* at p. 9). Dr. Nadel states in his deposition that this initial exam on September 22, 2015, was "incomplete." (Doc. 141-2, pp. 28, 29). Dr. Nadel further testified that anyone who has an injury "should have the peripheral retina examined[,]" which according to the medical records was also not preformed. (Doc. 141-2, p. 29). Furthermore, Cox states that during the exam following the OCT, Dr. Brummel told Cox he was unable to read the medical chart. (Doc. 142, p. 10; Doc. 137-6, p. 17). Finally, Cox argues that Dr. Brummel's prescribed treatment plan was the easier, less effective treatment, despite knowing about Cox's continuous pain, extreme light sensitivity, and reduced vision. (Doc. 142, p. 11).

The Court finds that Cox has not presented any evidence that Dr. Brummel actually knew about the delay in treatment from the time of being injured on August 6, 2015, to his initial appointment with Dr. Brummel on September 22, 2015. As such, the Court grants summary judgment to the extent Cox is claiming that Dr. Brummel was deliberately indifferent for failing to provide treatment for forty-five days following his injury. *See Alexander v. Richter,* 756 F. App'x 611, 614-15 (7th Cir. 2018).

The Court denies the motion for summary judgment, however, as to Cox's claim that Dr. Brummel provided him with constitutionally inadequate treatment for his eye injury and continuous pain. While Sikorski argues that Dr. Brummel provided ongoing treatment, and Dr. Cohen reports that Cox's claims regarding damage to his vision and

eye are caused by the trauma and are not a "product of neglect for his care" (Doc. 142-5, p. 7), Dr. Nadel's testimony calls into question the reliability of the medical records and whether Dr. Brummel's treatment departed from professional standards. *See Whiting,* 839 F.3d at 664 (to survive summary judgment a plaintiff needs "to present evidence sufficient to show that [the doctor's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment.'") (quoting *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006)). Accordingly, the Court finds there is a question of fact as to whether Dr. Brummel was deliberately indifferent, and he is not entitled to judgment as a matter of law.

### III. *Deliberate Indifference Claim Against John Baldwin, Christine Brown, Stacey Brown, and Jacqueline Lashbrook*

Defendants Baldwin, Christine Brown, Stacey Brown, and Lashbrook do not dispute that Cox's eye injury is a serious medical need. Accordingly, the issue before the Court is whether each defendant acted with deliberate indifference regarding Cox's medical treatment.

### a. *John Baldwin*

John Baldwin, the former action director of the Illinois Department of Corrections ("IDOC"), argues that his actions have not risen to the level of deliberate indifference. (Doc. 125, p. 13). He states that the only evidence regarding his possible involvement in Cox's medical treatment is his alleged signature on the responses to grievances. (*Id.*). Baldwin claims that he was not responsible for providing direct medical care to Cox, and the grievance documents demonstrate that he, or a representative on his behalf, ensured

that Cox was being seen by medical providers and provided medical care. (*Id.*). As a nonmedical professional, he believed that Cox was in the capable hands of the providers at Pinckneyville. Although Cox states that he also mailed Baldwin letters informing Baldwin of his medical issues, Cox provides no documentation and admits he has never met Baldwin. (*Id.*).

Cox refutes Baldwin's argument that as a nonmedical professional he must rely on the opinions of doctors. Cox claims that his grievances and letters were stating that he was not actually being evaluated by medical staff or receiving treatment for his pain and so his complaints did not require medical expertise. (Doc. 137, p. 9).

The Court finds that John Baldwin is entitled to summary judgment. First, Cox presents no evidence to indicate that Baldwin read or even received the letters that he alleges to have sent Baldwin regarding his medical care. *See Johnson v. Snyder,* 444 F.3d 579, 584 (7th Cir. 2006) (overruled on other grounds) (ruling that the fact of sending a letter or letters to the director was insufficient to create a genuine issue of material fact, as there was "no evidence that [the director] actually read [the plaintiff's] communications or had any subjective awareness of [the plaintiff's] condition."). In the Amended Complaint, Cox specifically alleges that on February 5, 2016, he wrote "Springfield in regards to me having eye-surgery [because] I believe my vision is getting wors[e] with every-passing-day." (Doc. 8, p. 75). Assuming Baldwin did see and read this letter requesting surgery, this evidence would not be sufficient to establish liability. *See Vance v. Peters,* 97 F.3d 987, 933 (7th Cir. 1996) ("[t]he plaintiff still has the burden of demonstrating that the communication, in its content and manner of transmission, gave

the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety."). This letter was requesting a specific form of treatment, and at this time Cox was being seen by Dr. Brummel and had been referred to an outside clinic for treatment. The Seventh Circuit has held that "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett,* 658 F.3d at 755.

Second, to the extent Cox is arguing that Baldwin cannot argue he was relying on the judgment of medical professionals when reviewing the grievances because Cox was grieving the delay in medical care, this argument does not coincide with the timelines in the record. The earliest grievance filed on August 10, 2015, was received by the Administrative Review Board on October 21, 2015. Along with the grievance, the Administrative Review Board received information that Cox had been seen at this point by a medical doctor on August 6, 2015, and August 11, 2015, and scheduled to be evaluated by an optometrist. (Doc. 125-6, p. 8-9). While the accuracies of the medical records are now being questioned, Cox has not presented any evidence that Baldwin had any reason to believe that Cox was not being treated by medical staff at that time, and therefore acted deliberately indifferent in concurring with the Administrative Review Board. *Hayes v.* Snyder, 546 F.3d 516, 527 (7th Cir. 2008). Because Cox has not submitted evidence showing a genuine issue of material fact that Baldwin knew of the alleged constitutional violation and turned a blind eye, Baldwin is entitled to summary judgment.

Finally, as to the allegation that Baldwin is directly responsible for the treatment

of IDOC inmates and has power to direct all IDOC personnel, Baldwin cannot be vicariously liable for the acts of his staff. *See Keller v. Elyea,* 496 F. App'x 665, 667 (7th Cir. 2012).

**b.** ***Jacqueline Lashbrook, Stacey Brown, and Christine Brown***

Defendants argue that they are not responsible for providing direct medical care to Cox and relied on the opinions of the doctors. (Doc. 125, p. 14 -16). They state that the grievance documents demonstrate that they ensured Cox was seen by medical providers and received medical care, and Cox has failed to show that their actions rose to the level of deliberate indifference. (*Id.*).

According to the records, Lashbrook received the first grievance containing complaints regarding the lack of medical treatment for Cox's eye injury on August 14, 2015. (Doc. 137-5, p. 2). On this date, Lashbrook determined that the grievance was not an emergency. Then, on September 10, 2015, she determined his grievance filed on September 4, 2015, was an emergency and should be expedited, but as previously mentioned by this Court, the warden took no other action. (Doc. 125-6, p. 6; Doc. 87, p. 8; Doc. 137-1, p. 2). Cox alleges he also verbally notified Lashbrook twice during her rounds through the segregation wing between August 6, 2015, and September 6, 2015, that he had not been examined by a physician and was in an immense amount of pain. (Doc. 137-6, p. 47; Doc. 137-8, p. 7).

Grievance records demonstrate that the earliest Stacey Brown, a counselor at Pinckneyville, received a grievance from Cox was on October 13, 2015, after his appointment with Dr. Brummel. (Doc. 125-6, p. 6). Cox also alleges, however, that he told

Stacey Brown verbally on three occasions, prior to the appointment with Dr. Brummel, that medical staff was not evaluating his eye or providing him pain medication, and she ignored his complaints. (Doc. 137, p. 6).

Similarly, Cox claims that he sent twenty request slips to healthcare addressed to Christine Brown, the healthcare administrator. He states that he did not receive a response from the requests slips to healthcare, and they are missing from the medical record. (Doc. 137-6, p. 7).

In this case, there is a question of fact as to whether Lashbrook, Stacey Brown, and Christine Brown disregarded an excessive risk to Cox's health by failing to ensure that Cox was being treated, as he alleges. Although nonmedical prison administrators may generally defer to the decisions of medical professionals, *see, e.g. Berry,* 604 F.3d at 440, Cox asserts that he was not being treated for his eye injury and pain for over month following his injury and that he contacted Defendants in an attempt to resolve the issue. While Defendants claim that they believed that Cox was being seen by medical personnel and in capable hands, the subject of all his complaints was his eye had not been examined, he was experiencing vision loss, and he was in continuous pain. (Doc. 137-8, p. 7). This is less a question of medical judgment and more an issue as to whether Cox was receiving adequate treatment at all. A prison official may be found to be deliberately indifferent to a prisoner's serious medical needs if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (*or not treating*) a prisoner." *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008) (emphasis added). Additionally, "delays in treating painful medical conditions that are not life-threatening can support Eighth

Amendment claims." *Gutierrez v. Peters,* 111 F.3d 1364, 1371 (7th Cir. 1997). As "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor[,]" *Liberty Lobby, Inc.,* 477 U.S. at 255 (citation and quotation marks omitted), there are multiple issues of fact regarding whether Cox was being treated by medical staff at Pinckneyville, and if Lashbrook, Stacey Brown, and Christine Brown disregarded the risk to his safety by failing to act and ignoring his medical complaints, exacerbating the injury and prolonging his pain. *See Petties,* 836 F.3d at 730-31.

Lashbrook, Stacey Brown, and Christine Brown further argue that they are entitled to qualified immunity as to Cox's claims against him. Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson,* 555 U.S. at 232; *Brosseau v. Haugen,* 43 U.S. 194, 197 (2004); *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Humphries v. Milwaukee Cty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citations and quotation marks omitted).

The Court has already determined that there are disputes of material fact that

prevent a finding that Defendants did not engage in a constitutional violation. Furthermore, accepting Cox's allegations as truth, the "Supreme Court has long held that prisoners have an Eighth Amendment right treatment for their serious medical needs. For the purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury." *Estate of Clark v. Walker,* 865 F.3d 544, 553 (7th Cir. 2017). As such, Lashbrook, Stacey Brown, and Christine Brown are not entitled to qualified immunity.

## IV.    *Failure to Protect Claim Against Leslie Wood*

Correctional Officer Leslie Wood claims that he was not the responding officer to the incident between Cox and his cellmate. (Doc. 125, p. 9). His timecard proves that he was not working at Pinckneyville on August 6, 2015, and Cox has not offered any evidence demonstrating that Wood was the responding officer. Cox states in his deposition that Cox was told by another officer that the responding officer's name was "Wood." (*Id.*). Furthermore, even if it were taken as true that Wood was the responding officer, he is still entitled to summary judgment. Wood argues it is undisputed that the responding officer shouted for Cox's cellmate to stop, and both inmates were removed from the cell and immediately taken to healthcare. Though there is a factual dispute over whether Cox was handcuffed in the cell while his cellmate was unrestrained, this action was at worst negligent on the part of the responding officer and does not demonstrate deliberate indifference. (*Id.*).

The record contains insufficient evidence that Wood did not take serious measures to abate the risk to Cox's safety. Cox in his deposition states that the responding officer

came to the cell, ordered him to turn around and cuff up through the chuckhole, and he complied. (Doc. 137-6, pp. 23, 25). The officer radioed control requesting for the cell door to be opened, but nothing happened. While the officer was waiting for control to open the cell door, Cox's cellmate grabbed the book and hit Cox three to four times. The officer told the cellmate to stop. (Doc. 138, p. 3). The responding officer then left for forty-five seconds and returned with another officer who then opened the cell door with a key. The officers then "snatch[ed]" Cox "out of the way." (Doc. 137-6, pp. 23, 25). Cox argues that Wood's choice to handcuff his "arms behind his back, with the cell door locked, after his cellmate attacked him quite obviously created a substantial risk of serious harm that rises to the level of deliberate indifference…." (Doc. 137, p. 10).

Assuming that Wood was the responding officer, Cox's allegations pertain to Wood's role in responding to the attack, not that Wood had knowledge of any risk to Cox prior to the altercation. Though there may have been a better choice in restraining Cox and his cellmate, the Court finds that Wood's decision to handcuff Cox prior to removing him from the cell does "not cross the line from negligently enabling the attack to recklessly condoning it." *Giles v. Tobeck,* 895 F.3d 510, 514 (7th Cir. 2018). As testified to by Cox, once Wood saw that Cox was being hit with the book, he ordered the cellmate to stop and quickly found help to open the cell door. He "did not deliberately abdicate [his] responsibility." *Giles,* 895 F. 3d at 514. "A jury could conclude that [Wood] showed poor judgment…but such a mistake would not be enough to show the reckless disregard necessary for an Eighth Amendment violation." *Id.* (citing *O'Brien v. Ind. Dep't of Corr. ex rel. Turner,* 495 F. 505, 510 (7th Cir. 2007)). Therefore, Wood is entitled to summary

judgment.[6]

**DISPOSITION**

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment filed by Marcia Hill, Traci Peek, and Vipin Shah. (Doc. 122). The motion is granted as to Cox's claim that Nurse Peek was deliberately indifferent by failing to examine his eye following the altercation on August 6, 2015. The motion is denied as to Cox's claim that Nurse Hill, Nurse Peek, and Dr. Shah failed to treat his pain and to Cox's claim that Nurse Hill and Dr. Shah provided constitutionally inadequate treatment.

The Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment filed by Karen Sikorksi. (Doc. 134). The motion is granted as to Cox's claim that Dr. Brummel was deliberately indifferent to the delay in care following the altercation on August 6, 2015, and denied as to Cox's claim that Dr. Brummel provided constitutionally inadequate treatment for his injury and subsequent pain.

Finally, the Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment filed by John Baldwin, Christine Brown, Stacey Brown, Jacqueline Lashbrook, and Leslie Wood. (Doc. 125). The motion is granted as to Baldwin and Wood, but denied as to Christine Brown, Stacey Brown, and Lashbrook. Accordingly, the claims against Baldwin and Wood are **DISMISSED with prejudice.** The Clerk of Court shall terminate them as defendants and enter judgment in their favor at the conclusion of the entire

---

[6] Because the Court has concluded that the evidence does not create a genuine issue of material fact as to whether Defendant Wood violated Cox's Eighth Amendment rights, it will not address his claim of qualified immunity.

action. The Clerk of Court is further **DIRECTED** to correct the docket in accordance with footnote 1.

Cox's claims of deliberate indifference shall proceed against Peek, Shah, Hill, Sikorski, Lashbrook, Stacey Brown, and Christine Brown and remain pending.

A telephone conference will be set at a later date (when the suspension of jury trials in the district due to COVID-19 has ended) to set firm dates for a final pretrial conference and jury trial.

**IT IS SO ORDERED.**

**DATED:** April 1, 2020

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**